UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DETROIT METROPOLITAN AIRPORT
TAXI ASSOCIATION,

    Plaintiff,

v.

DETROIT METROPOLITAN WAYNE
COUNTY AIRPORT AUTHORITY, et al.,

    Defendants.
_____/

Case No. 09-cv-14041

HONORABLE STEPHEN J. MURPHY, III

## OPINION AND ORDER DENYING PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

### INTRODUCTION

In the instant action plaintiff Detroit Metropolitan Airport Taxi Association ("DMATA") seeks a temporary restraining order ("TRO") and an order to show cause for preliminary injunctive relief[1] prohibiting defendant Detroit Metropolitan Wayne County Airport Authority, et al. (the "Airport Authority") from terminating its contract with DMATA, and physically removing DMATA members and property from the Detroit Metropolitan Wayne County Airport ("Airport") on October 16, 2009 at 11:59 pm. The underlying verified complaint alleges breach of contract and unlawful discrimination.

### FACTS AND PROCEDURAL HISTORY

The complaint alleges a combination of contractual and constitutional violations by the Airport Authority. The motion for preliminary injunction, however, essentially requests

---

[1] E.D. Mich. LR 65.1 provides: "Requests for temporary restraining orders and for preliminary injunctions must be made by a separate motion and not by an order to show cause." Therefore, the Court treats DMATA's request for a show cause order instead as a motion for a preliminary injunction.

that the Airport Authority be prevented from breaching the contract with the plaintiff. The background facts below come from DMATA's complaint as well as from the statement of facts in the Airport Authority's opposition brief, each of which are supported by affidavits from DMATA Airport Authority officers.

DMATA is an association of 340 owners and drivers of taxicabs who operate out of the Detroit Metropolitan Airport. Almost all of its members are from the Middle East, India, Pakistan, Somalia or and Bangladesh. Compl. ¶ 1. The Detroit Metropolitan Wayne County Airport Authority ("Airport Authority") is the governmental authority responsible for all operations at the Detroit Metro Airport. Compl. ¶ 3. The other defendants are various officers and employees of the Airport Authority being sued in their individual and official capacities.[2] Compl. ¶ 4-9.

1. <u>The Concession Agreement and Amendments Thereto</u>

On June 13, 2007, DMATA entered into an agreement with the Airport Authority for the exclusive provision of on-demand metered taxicab concession services at the Airport. Def's Resp. Br. at 2. The agreement lasts until August 31, 2012, with an option to extend for two years by the Airport Authority. Under Article IV of the agreement, in exchange for the exclusive right and obligation of providing such services at the Airport, DMATA was required to pay a concession fee to the Airport Authority every three months in advance of the upcoming three-month period. *Id.* On September 23, 2008, the parties amended the

---

While the complaint names as defendants various officers and employees of the Airport Authority, the motion for preliminary injunctive relief apparently seeks relief solely against the Airport Authority. The Court is not aware that any of the other named defendants received personal notice of the complaint and of the hearing. Counsel appeared only on behalf of the Airport Authority. Accordingly, this order addresses and relates only to the Airport Authority.

agreement to reduce the concession fees. Under the amendment, the payments due June 1, 2009 and September 1, 2009 were reduced to $462,000 and $534,600 respectively. *Id.*

On March 1, 2009 and June 1, 2009, DMATA failed to pay the full amounts of the concession fees for the upcoming three-month periods, claiming payment of the concession fee created an economic burden. *Id.* In June 2009, the Airport Authority entered into negotiations with DMATA concerning the possibility of again amending the agreement to change the payment schedule. Under the most recent proposed amendment, the concession fee would be paid on the last day of the month, for the prior month, eliminating the up-front payment. Additionally, the Airport Authority was willing to reduce the annual payment by $500,000 per year for the remaining three years on the agreement. *Id.* at 3.

Jack Vogel, Senior Vice-President for Business Development for the Airport Authority, conveyed this most recent proposed amendment to DMATA's counsel and advised that the proposal would be presented for Board approval on September 29, 2009. Before the Board could approve it, however, DMATA had to sign the proposed amendment and become current with the concession fee payments. On September 14, 2009, DMATA remitted a cashier's check for the balance of the then outstanding amount of the June 1, 2009 concession payment, and informed the Airport Authority that it was prepared to accept the terms of the proposed amendment. *Id.* at 3.

On the eve of the scheduled board meeting, DMATA's counsel contacted Airport Authority counsel and informed her that DMATA would not sign the proposed agreement, and that DMATA wanted to re-negotiate the proposed amendment. The Airport Authority refused to re-negotiate and the proposed amendment was not presented to the board at

the September 29, 2009 meeting. *Id.* at 4.

On or around September 30, 2009, the Airport Authority terminated the original agreement and amendments thereto because DMATA had failed to pay the concession fee in the amount of $534,600 due September 1, 2009.  It sent a letter to this effect to the President of DMATA and gave DMATA until October 16, 2009 at 11:59 to wind up operations and return all Airport property to Airport officials. *Id.*

2.  Alleged Unlawful Discrimination

At some point after the execution of the taxicab agreement in 2007, things turned sour between the parties. The complaint does not contain the information set forth above regarding the contractual issues, but instead focuses on alleged unlawful discrimination perpetrated by the Airport Authority against DMATA members.

The allegations in the complaint seem to fall into three distinct categories.  First, DMATA alleges that Airport Authority has "consistently harassed, intimidated, and discriminated against members of DMATA" for the impermissible reason that "DMATA is a minority owned and controlled entity."  Compl. ¶¶ 15, 16.  Specifically, Airport Authority agents would require DMATA members to wait four to five hours to reach the front of the line to pick up arriving passengers, only to be told to return to the back of the line over "minuscule and ridiculous" claims such as untidy cars, small scratches, or speeding. Agents for the Airport Authority would also allegedly attempt to disrupt and prevent DMATA members from completing prayer at the airport.  The members' identification cards would be confiscated for hours or days at a time for honking horns, blocking traffic, and for shouting "taxi" in the presence of passengers.  Compl. ¶ 17.

Second, the compliant alleges the Airport Authority interfered with DMATA members'

ability to pick up passengers and to generate revenue. It would permit other ground transportation companies at the airport to take first priority in picking up passengers, and permit other companies to erect booths inside the terminals for immediate pick-up, while prohibiting such action by DMATA members. It also permitted DMATA's competitor to reduce destination rates or permit coupons to reduce the rates in violation of the contract, but disallowed similar conduct by DMATA. The Airport Authority would also permit competitors to physically enter the airport and directly solicit passengers, but allegedly prohibited DMATA from doing the same. Compl. ¶ 17.

Third, the Airport authority failed to provide sanitary and humane conditions for DMATA members, instead offering them a single bathroom, drinking fountain, and lounge for use by over 300 people. The lounge allegedly lacked air-conditioning and a heating system. Compl. ¶ 17.

The Airport Authority responds that the race of DMATA owners and its members was not a factor in the Airport Authority's decision to terminate the agreement. The decision was made solely because DMATA failed to pay the concession fee required under the contract.

3.      Procedural Background

On October 12, 2009, at around 11:00 am, DMATA filed its complaint and motion for TRO and preliminary injunction. The complaint includes five counts: 1) violation of due process (procedural and substantive); 2) violation of the Fourteenth Amendment's Equal Protection Clause; 3) civil rights violation under 42 U.S.C. § 1983; 4) breach of contract in violation of 42 U.S.C. § 1981; 5) state law claim of breach of duty of good faith and fair dealing.

Counsel for the Airport Authority was contacted by counsel for DMATA[3] and was served with the complaint and motion via email and certified mail. The Airport Authority's counsel filed a response brief on October 14, 2009 around 12:30 pm. At 3:30 pm the same day, the Court convened a hearing on the TRO and preliminary injunction. At the close of the hearing, the Court denied the TRO finding there had not been a sufficient showing of irreparable injury, and took under advisement the request for a preliminary injunction. The Court advised that it would accept further briefing on the preliminary injunction request and opposition submitted no later than 5:00 p.m. on October 15, 2009. Counsel for the Airport Authority submitted a timely and concise brief with a courtesy copy. Counsel for DMATA, however, submitted 206 pages of filings after the Court's imposed deadline, without a courtesy copy. Its filing included duplicates of original filings, and an additional twenty-page brief.

## DISCUSSION

**I. Legal Standard**

The decision of whether to issue a preliminary injunction lies within the sound discretion of the district court. *See Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996). As noted by the Supreme Court and Sixth Circuit, "[t]he purpose of a preliminary injunction is merely to preserve the status quo until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Certified Restoration Dry Cleaning Network, L.L.C., v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). The issuance of a preliminary injunction is an extraordinary remedy which should be granted only if the

---

[3] It is not clear whether counsel for DMATA in this action also represented DMATA in negotiations with the Airport Authority.

movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant such an "extraordinary remedy" a district court must consider four factors: 1) whether the movant has a strong likelihood of succeeding on the merits; 2) whether the movant will suffer irreparable injury absent the injunction; 3) whether issuing the injunction will cause substantial harm to others; and 4) whether the public interest will be furthered by the issuance of the injunction. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). These factors simply guide the court's discretion and not are "rigid and unbending requirements." *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). A district court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive of the issue. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

## II.     Analysis

DMATA asserts five interrelated and overlapping avenues for relief. The Court will address the likelihood of success on the merits of each claim, and then consider the other three factors in considering an request for a preliminary injunction. In the end, the Court finds that because there is only a small, if any, likelihood of success on the merits, and because DMATA has not sufficiently shown irreparable injury, the Court declines issue a preliminary injunction.

As a threshold matter, the complaint and motion assert both a "Civil Rights Violation 42 U.S.C. § 1983," and various constitutional challenges. Compl. Count III, ¶ 31-35. 42 U.S.C. § 1983, however, is merely a vehicle for asserting violation of rights established elsewhere, and does not create any substantive rights. *Gardenhire v. Schubert*, 205 F.3d

7

303, 310 (6th Cir. 2000) (*citing Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)); *see also Thomas v. Shipka*, 81 F.2d 496, 499 (6th Cir. 1987) ("[I]n cases where a plaintiff states a constitutional claim under 42 U.S.C. § 1983, that statute is the exclusive remedy for the alleged constitutional violations."), *vacated on other grounds*, 488 U.S. 1036 (1989). *All* of DMATA's constitutional claims are brought under 42 U.S.C. § 1983, and the Court does not address Court III as an independent substantive claim for relief.

**A. Likelihood of Success on the Merits**

1. Due Process

Although the complaint alleges violations of substantive and procedural due process, the request for preliminary injunctive relief includes argument only as to the procedural due process claim. Accordingly, the Court considers only the procedural due process claim, leaving for later consideration, and further briefing, DMATA's substantive due process filing.

The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "nor shall any State deprive any person of life, liberty, or property, without due process of law ... " U.S. Const. amend. XIV, § 1. To establish a procedural due process claim, a plaintiff must establish three elements: 1) he/she has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; 2) he/she was deprived of this protected interest within the meaning of the Due Process Clause, and (3) the state did not afford him/her adequate procedural rights prior to depriving them of their protected interest. *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

DMATA asserts that it has a protected property interest in the agreement with the Airport Authority, thereby triggering the requirements of due process. The Airport Authority argues that no such property interest exists because a simple breach of a contract does

not rise to the level of a constitutional violation.

Property interests are not defined by the Constitution, but rather are created and defined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

The Sixth Circuit has held that a constitutionally protected property interest in a publicly bid contract can be demonstrated by showing that the bidder was awarded the contract and then deprived of it. *Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir. 1996); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992). In this case, DMATA was awarded an open bid contract for on-demand metered taxi services at the Airport. It appears, however, that although DMATA was awarded the contract, it did not have a legitimate claim of entitlement to its benefits. From the evidence and admission presented thus far, DMATA was aware it was delinquent in concession fees and that the agreement expressly provided that failure to pay the fee would result in the automatic termination of the agreement. Any claim of entitlement DMATA had regarding the contractual benefits was not "legitimate" absent the payment of fees – which the plaintiff admittedly did not do. Accordingly, at this stage, the Court finds that DMATA will not likely succeed in establishing a property interest cognizable under *Enertech*.

Even if DMATA could show it had a protected property interest, which is not likely, that would not end the due process analysis. *See Ramsey v. Board of Educ. of Whitley*

*County, Ky.*, 844 F.2d 1268, 1272 (6th Cir. 1988).  Assuming the Airport Authority's termination of the contract deprived DMATA of its property interest in satisfaction of the second prong, DMATA has not demonstrated it will succeed in showing the state did not afford it adequate procedural rights before depriving them of the interest.

Not every deprivation of liberty or property requires a pre-deprivation hearing or a federal remedy.  *Ramsey*, 844 F.2d at 1272.  Determining what process is due in a given case requires consideration of various factors.  *Id.*  The Court must bear in mind that the fundamental requirement of Due Process is the opportunity to be heard.  *Id.* In some cases, due process is satisfied by the opportunity for hearing in state court after a deprivation of property has been heard.  *Id.*  A state breach of contract action may provide an adequate remedy for deprivation of a contractually created property interest.  *Id.* at 1273.  A state action is an adequate remedy for a property deprivation when the only basis for federal jurisdiction is that a state actor is one of the contracting parties.  *Id.*  "Indeed, it is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim."  *Taylor Acquisitions, LCC v. City of Taylor*, 313 Fed. Appx. 826, 831 (6th Cir. 2009) (unpublished) (*quoting Ramsey*, 844 F.2d at 1273).

The Airport Authority's termination of the taxicab agreement in this case falls within the category of cases that would most appropriately be remedied by a state breach of contract action.  Any property interest could have only arisen out of the agreement itself.  The only difference between this case and any other "garden-variety" breach of contract case is that the Airport Authority happens to be one of the contracting parties.  *See Taylor*, 313 Fed. Appx. at 832 (applying same analysis).

Although the Court finds that DMATA has perhaps demonstrated the deprivation of

a property interest, it has likewise not demonstrated that an appropriate remedy is a section 1983 action in federal court. The remedy for breach of contract is more appropriately determined in a breach of contract action in state court. Accordingly, DMATA has not demonstrated it will likely succeed on its procedural due process claim.

2. Equal Protection

DMATA's claim that the Airport Authority violated the Equal Protection Clause of the Fourteenth Amendment is entirely unrelated to the preliminary injunctive relief DMATA seeks. The motion for preliminary injunction specifically requests the Court to issue an order that: 1) prevents the Airport Authority from interrupting DMATA in providing taxicab services at the airport; 2) prevents the Airport Authority from allowing other contractors to perform the services performed by DMATA; 3) prevents the Airport Authority from opening bidding for the services performed by DMATA; and 4) prevents the Airport Authority from canceling or unilaterally amending the contract.

These requests relate solely to the contract between DMATA and the Airport Authority. DMATA is not seeking, for example, an court order prohibiting the Airport Authority from discriminating against DMATA or its members. Rather, DMATA seeks to prevent termination of the contract and removal from the airport. In fact, granting the relief requested by DMATA would not in any way prevent any further alleged discriminatory conduct. Insofar as the claim of unlawful discrimination does not relate to the requested relief, the Court finds no reason to address the likelihood of DMATA succeeding on the merits of the claim.

3. Breach of Contract

Count IV of the complaint is titled "Breach of Contract (Violation of 42 U.S.C. §

1981)." It alleges discriminatory enforcement of the contract in violation of 42 U.S.C. § 1981. The motion for preliminary relief, however, is bereft of any discussion of breach of contract, rather devoting many pages to a discussion of racial discrimination by the Airport Authority. The Court addresses the breach of contract claim anyway, since it is really the basis of the entire dispute. In the end, the Court finds DMATA is not likely to succeed on its breach of contract claim.

> Article IV of the agreement between the Airport Authority and DMATA provides:
>
> For the right and obligation of being allowed to provide the Metered Taxicab Concession at the Airport, the CONCESSIONAIRE shall pay the AIRPORT AUTHORITY for and during the term of this Agreement without notice, or demand, free from any and all claims, deductions, creditors or set-offs and at such times and in such manner as hereinafter provided, a Concession Fee for each year of operation, calculated by multiplying the number of taxicabs operated at the Airport by the applicable Annual Fee as set forth in Exhibit A. The Concession Fee shall be prepaid by the CONCESSIONAIRE in four (4) equal payments the first of which will be due and payable on the date of the Notice of Award, and thereafter the Concession Fee shall be due and payable on the first day of the month, every three (3) months, beginning the first day of the first of the three months. ***Failure of the CONCESSIONAIRE to pay the required Annual Fee for any Taxicab will result in automatic termination of this Agreement.***

(emphasis supplied). DMATA admits that, "On September 1, 2009, an advance payment of $534,000 became due under the contract." Pl. Motion, at 2. DMATA admittedly did not pay that amount as required, thereby breaching the contract. The clear terms of Article IV of the agreement provides that failure of the concession fee terminates the contract.

"The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650 (1994). Because DMATA admittedly breached the contract by not paying the concession fee due under the contract, it cannot maintain and action against the Airport Authority for alleged subsequent breach of the

contract.

DMATA argues in its discussion of the procedural due process claim that the Airport Authority failed to terminate the contract in accordance with the cancellation provisions set forth in Article XXIV.  But this is a contract claim, and Article XXIV provides that the Airport Authority may cancel the agreement for DMATA's nonperformance of any provision only after having given written notice and waiting 30 days.  This provision is arguably at odds with Article IV, which provides for *automatic* termination of the agreement upon nonpayment of the concession fee when due. Under Michigan law and traditional principles of contract interpretation, the agreement's specific provisions, where applicable, govern over its more general terms.  *W. World Ins. Co. v. Lula Belle Stewart Ctr., Inc.*, 473 F. Supp. 2d 776, 782 (E.D. Mich. 2007) (*citing Wait v. Newman*, 284 Mich. 1, 4 (1938)).  The specific terms in Article IV, providing for automatic termination, trump the more general terms in Article XXIV, which would allow notice to DMATA before termination.  DMATA has offered no argument or legal authority that controvert this conclusion.  Therefore, at this stage, it does not appear DMATA will succeed in its breach of contract claim.

       4.  Breach of Implied Covenant of Good Faith and Fair Dealing

Count V of the complaint asserts that the Airport Authority's unlawful conduct in "executing the terms of the agreement violates Michigan [sic] implied covenant of good faith and fair dealing."  Compl ¶ 43.  The motion for preliminary injunctive relief attempts to assert this as independent claim.

It is true that Michigan common law recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of a contract.  *See Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243 (1984). Michigan does not, however,

recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing separate from an action on the underlying contract. *Belle Isle Grill Corp v. City of Detroit*, 256 Mich. App. 463, 279-80 (2003); *Ulrich v. Federal Land Bank*, 192 Mich. App. 194, 197 (1991). DMATA claim is asserted separate from its breach of contract claim and therefore, is not likely to succeed.

**B.     Irreparable Injury**

The second factor the Court must consider for a preliminary injunction is whether the plaintiff has demonstrated it will suffer irreparable injury if the injunctive relief is not granted. DMATA contends it has demonstrated irreparable injury because if the concession agreement is terminated, DMATA will be forced out of business, which will make destitute its individual members as well. This is apparently because DMATA exists only to maintain the concession agreement with the Airport Authority.

Sixth Circuit decisions establish that a company's substantial loss of market share, complete dissolution, or bankruptcy do not constitute irreparable harm, because it too can be compensated by money damages. *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 969 (W.D. Mich. 2008) (*citing Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir.1991); *United Food & Comm'l Workers Union, Local No. 626 v. Kroger Co.*, 778 F.2d 1171 (6th Cir. 1985); *Eberspaecher North Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592 (E.D. Mich. 2008)).

Plaintiff relies in part on *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373 (6th Cir. 1995) for the opposite proposition – that impending loss or financial ruin of a plaintiff's business *can* constitute irreparable injury. In *Performance*, the plaintiff sought an injunction requiring the defendant to pay royalties due under the license

agreement. The Sixth Circuit concluded the district court erred in denying preliminary injunctive relief. The Court of Appeals found that if the injunction did not issue, later arbitration proceedings on the royalties issue, agreed to by the parties, would be meaningless, as the business would no longer exist due to economic collapse and insolvency. *Id.* at 1381.

In support of its finding, the Sixth Circuit relied almost exclusively on the uncontradicted statements of Performance's president that "[t]he license agreement between Performance Unlimited and Questar is by far the single most significant royalty-producing license agreement that Performance Unlimited has, and royalties received from the license constitute the single largest amount of royalty income received by Performance unlimited yearly." *Id.* at 1381. Further, the president stated, "if Questar does not pay its accrued royalties, Performance will not be able to meet payroll, pay federal withholding taxes, pay vendors, pay royalties owed to licensees, or indeed to continue to operate more than another two to three weeks. " *Id.*

The Court does not agree that *Performance* stands for the proposition that financial ruin of a company *necessarily* constitutes irreparable injury, as DMATA would have it. The Court's discretion is guided rather by the fundamental principle that "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. The Court finds that any loss to DMATA as a result of denial of the request for a preliminary injunction is compensable by an award of money damages in the amount of DMATA's expectation interest under the contract.

As DMATA rightly recognizes, the Court must consider the potential irreparable injury to DMATA, and *not* its individual members, who are not plaintiffs in this lawsuit.

DMATA has not established a similar factual basis to that in *Performance* required for the Court to find that *Performance* controls a similar outcome in this case. In *Performance* the testimony from the plaintiff established that it would suffer complete dissolution if the defendant were not required to submit the royalties. Supporting this was the fact that without the royalty payments from the defendant, the plaintiff would be unable to pay employees, pay federal withholding taxes, pay vendors, pay other expenses, or even continue to operate for more than a few weeks. In contrast, DMATA has not demonstrated that it has similar expenses such as paying its member-drivers, vendors, or any other expenses except for the quarterly concession fees under the agreement, which it need not pay if the contract is terminated.

DMATA has not offered any documentary evidence, other than a few self-serving conclusory statements, that demonstrate it would not be able to cease operations during the litigation and resume provided it prevails on the merits of the lawsuit and is awarded damages. There is no evidence of complete dissolution of DMATA in the absence of a preliminary injunction.

Therefore, the Court finds that DMATA has not demonstrated it will suffer irreparable injury if the Court does not grant preliminary injunctive relief. Most importantly, it appears money damages for any alleged wrong committed by the Airport Authority will adequately compensate DMATA.

**C. Remaining factors**

The Court concludes that DMATA is not likely to succeed on the merits and that it will not suffer irreparable harm if preliminary relief is denied. Therefore, it need not proceed to the final two factors in the analysis. *See Jones*, 341 F.3d at 476 (district court is required

to make specific findings concerning each of the four factors if fewer factors are dispositive of the issue). The Court considers these factors out of caution.

The third and fourth factors involve consideration of the how the presence or absence of preliminary injunctive relief would affect third-parties, including the defendant, and the public generally. If the injunction is issued, the Airport Authority will be substantially harmed by being forced to uphold its end of the agreement, while not receiving counter-performance by DMATA during the pendency of the lawsuit. It would provide DMATA a benefit to which it does not seem to be entitled, while at the same time preventing the Airport Authority from exercising its bargained-for right under the agreement to terminate the agreement upon DMATA's default. Instead of seeking public bids from willing on-demand metered cab companies for service in the Airport, the Airport Authority will be forced to continue to do business with an entity that has repeatedly failed to live up to its end of the agreement. The Court therefore, finds that issuing the injunction would subject the Airport Authority to substantial harm.

Finally, DMATA has not established the public interest would be served by issuance of the injunction. DMATA asserts in its motion that forcing its members to vacate would remove from the Airport the only affordable ground transportation, as it is the only organization providing low-cost taxicab services there. The evidence in the record controverts this claim, however. In order to meet the transportation needs at the Airport, the Airport Authority has issued a Request for Proposals for Metered Taxicab Concession seeking bids from contractors for on-demand metered taxicab services. Supp. Aff. of Jack Vogel, Def. Supp. Resp., Exhibit G, ¶ 6. In the meantime, the Airport Authority has requested that Metro Cars, the current luxury sedan concessionaire increase its fleet of 85

cars to 128 on a temporary basis to address the Airport Authority's on-demand ground transportation needs. *Id.* ¶ 7. Additionally, despite termination of the agreement, it is still possible for passengers to pre-arrange for pick-up at the Airport. DMATA and its members may even serve these needs.

Plenty of moderately-priced ground transportation from the Airport still exists. Passengers are free to use luxury sedans, public transportation, or shuttle services, all of which remain available. The lack of an on-demand metered taxi service centered at the Airport is not likely to last long in light of the pending Request for Proposal. Even if denial of preliminary injunctive relief were issued and temporarily caused inconvenience to arriving passengers, it is substantially outweighed by the public's interest in the enforceability of clear contract provisions.

## CONCLUSION AND ORDER

DMATA has not established that it is likely to succeed on any of its claims supporting the preliminary injunction. The Court has serious reservations regarding the legal competency of some of its claims, but will leave final determination of those claims for another day. It is simply enough to note at this point, that it does not appear DMATA will succeed on the merits of its claims. More importantly, DMATA has not established that denial of such extraordinary relief would cause it irreparable injury, as money damages, if awarded, would be an adequate remedy. The Court finds that ordering the extraordinary remedy of preliminary injunctive relief is not warranted and will deny DMATA's request.

**WHEREFORE**, it is hereby **ORDERED** that DMATA's Motion for Preliminary Injunction (docket no. 2) is **DENIED**.

**SO ORDERED.**

        s/Stephen J. Murphy, III  
        Stephen J. Murphy, III  
        United States District Judge

Dated: October 16, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 16, 2009, by electronic and/or ordinary mail.

        s/Alissa Greer  
        Case Manager